# DISTRICT COURT OF APPEAL OF FLORIDA
## SECOND DISTRICT

_____

In re Guardianship of Abigail Gore,
an incapacitated person.

CHRISTINE McGATHEY,

Appellant,

v.

BRIAN GORE, as guardian of
Abigail Gore, an incapacitated person,

Appellee.

No. 2D2023-2124

_____

December 27, 2024

Appeal from the Circuit Court for Pinellas County; Sherwood S. Coleman, Judge.

Jonathan Mann, Jessica L. Underwood, and Robin Bresky of Schwartz Sladkus Reich Greenberg Atlas LLP, Boca Raton, for Appellant.

Caitlein J. Jammo of Johnson, Pope, Bokor, Ruppel & Burns, LLP, Clearwater, for Appellee.

LaROSE, Judge.

Christine McGathey appeals the trial court's order appointing Brian Gore as Guardian Advocate for Abigail Gore, his daughter and an

incapacitated person.[1]  We have jurisdiction.  *See* Fla. R. App. P. 9030(b)(1)(A).

No competent substantial evidence supported the trial court's finding that Brian could meet Abigail's safety concerns and unique communication needs.  Further, the trial court seemingly discounted Abigail's testimony favoring Christine as her guardian.  We reverse.

## I.    <u>Background</u>

As a child, Abigail was diagnosed with Down Syndrome and Autism.  She lived with Brian and her mother, Kimberly Rowland, until they separated in 2001.  As Abigail grew, she lived with her mother and visited Brian occasionally.  Abigail's maternal grandmother, Christine, remained involved in Abigail's life and saw her regularly.

In late 2020, Abigail, her younger sister, Madeline, and Kimberly moved into Christine's home.  In the fall of 2021, Kimberly left her daughters in Christine's care and moved away.

On November 17, 2021, Brian petitioned to be appointed Abigail's guardian pursuant to section 393.12 of the Florida Statutes (2021).  Christine and Madeline, now an adult, filed a competing petition.  Kimberly consented to the appointment of Christine and Madeline; she objected to Brian's petition.

*A. The First Hearing*

In January 2022, the general magistrate conducted a hearing on the competing petitions.  Kimberly attended; the general magistrate acknowledged her consent form.

Without objection, the magistrate admitted into evidence a December 2021 letter from Abigail's treating physician, Abigail's January

---

[1] To avoid confusion, we use the first names of those involved.

2020 individual education plan (IEP), and a June 1999 occupational therapy evaluation. Those documents confirmed Abigail's childhood diagnoses.

The IEP reflected that, at 22-years-old, Abigail was in twelfth grade and had a basic understanding of her education curriculum. She also had "skills associated with attention and memorizing/recalling information," and required "[m]inimal prompting and assistance . . . on participatory level skills." The IEP continued that Abigail enjoys participating in classroom and community activities, follows directions when motivated, and understands the staff's instructions. The IEP also noted that Abigail "may require extensive prompts and additional processing time to initially engage in most activities," and "requires a modified curriculum and behavioral support during all learning activities." The IEP reported that Abigail "has become more willing to use her [Voice Output Communication Device[2]] or verbalize with prompting," and "makes choices, takes turns and answers questions with encouragement." The IEP expanded on Abigail's communication skills:

> Abigail communicates via gestures, facial expressions, words and word approximations, a static communication board, and a high[-]tech voice output device. She participates in classroom and community activities and language therapy group with verbal prompting. During language therapy group she demonstrates an ability to identify vocabulary, answer simple questions from a choice of answers, answer yes/no questions, indicate a want/need, request preferred items, follow directions, and greet. With prompting, she is able to

---

[2] A Voice Output Communication Device "utilizes a graphic-based system providing pre-recorded or programmed speech output in the form of words, phrases or sentences." Maureen M. Schepis, *A Comprehensive Evaluation of the Effects of Voice Output Communication Aids on the Communicative Interactions of Students with Autism,* INST. OF EDUC. SCIS., at 8 (Mar. 12, 1996), https://files.eric.ed.gov/fulltext/ED461203.pdf.

imitate words when given a model and to combine words to formulate short utterances on her communication device, and use the keyboard on her high tech communication device. She continues to demonstrate strengths in the area of responding to questions from a closed set of choices, and spontaneously using her device to indicate specific wants and needs. She is also demonstrating emerging skills in using a static core board for communication.

. . . .

[Abigail's] strengths in the area of instruction include her ability to follow familiar routines and expectations when she is motivated. She enjoys completing job boxes such as sorting colors and alphabetizing. When participating in group activities Abbey enjoys coming to the smartboard to answer questions and make choices. *She uses an ipad* [sic] *and computer independently.*

(Emphasis added.)

The magistrate heard from Brian, Christine, and Abigail. Brian testified that after separating from Kimberly, he maintained regular contact with Abigail until March 2020. According to Brian, Abigail cannot read or write. He has difficulty understanding her speech. Brian testified that Abigail understands people who speak to her in full sentences. But he believed that Abigail cannot respond to a full sentence, engage in a conversation, do mathematics, determine her residence, manage money, make medical decisions, or manage her affairs. Brian recognized that Abigail uses icons on an iPad to communicate. He acknowledges that her communication skills have improved. He only recently discovered that Abigail can spell.

Christine testified that Abigail started using a letter board device in July 2020 to communicate her thoughts. Abigail uses the device to communicate in full sentences. Christine explained that Abigail is capable of choosing her own residence and can perform mathematics.

4

But Abigail needs assistance with personal hygiene, traveling, and using money. Christine recognized that Abigail was at risk of exploitation if left alone. She was confident that Abigail has the capacity and ability to choose a place to live. Christine explained that Abigail is capable of visiting places and making an informed assessment about whether a place is safe.

Christine further detailed that Abigail receives Medicare benefits, attends an adult day program and sessions for Spelling to Communicate, has a behavioral specialist and support coordinator, and receives medical care from a doctor, neurologist, and dentist.

Next, Abigail testified with the assistance of Evelyn Modal, an educator and Spelling to Communicate practitioner. Evelyn facilitated Abigail's testimony by spelling out the letters that Abigail poked on her letter board. Evelyn explained that while Abigail pokes the letter board, she will encourage Abigail to finish spelling by telling her phrases like, "and" or "keep going."[3] Abigail indicates that she has completed her thought when she points to a certain part of the board, like the handle.

Abigail testified that she wants someone to help her make decisions. She favored Christine. Abigail enjoys the therapies and day program to which Christine takes her. She feels safe with Christine.

Abigail explained that she would like to visit Brian, but that she did not feel safe at his house. Abigail testified that a family member engaged

---

[3] The trial court cautioned Evelyn to refrain from making encouraging statements. The trial court wanted Evelyn to act as a translator. Evelyn repeatedly explained that the trial court's limitations impeded her ability to help Abigail communicate with the court.

in inappropriate behavior with her.[4]  Abigail wants to see Brian, his current wife (Kera), and her paternal grandmother (Grandma Carol), but not at Brian's house.

After hearing Abigail's testimony and learning that the Department of Children and Families (DCF) was investigating the abuse allegations, the trial court continued the hearing.

*B. The Hearings Continued*

A successor judge resumed the hearing in April 2023.  The trial court took judicial notice of the prior hearing and accepted the audio recordings of that hearing as Exhibit 1.  Over the course of two days, the trial court heard testimony from Brian, Kera, Jennifer Miller, Detective Carrero, Madeline, Christine, and Evelyn.

Consistent with his prior testimony, Brian testified that Abigail is very smart but has behavioral limitations and is developmentally delayed.  He stated that Abigail is moody, does not like loud noises, has difficulty transitioning through tasks, and has difficulty communicating.  Kera testified that Abigail throws tantrums and has difficulty transitioning from place to place.  Kera noted that she teaches Autistic children and she has communicated with Abigail's maternal family to help Abigail.  Kera opined that Abigail's cognitive age is around four years old.  Kera acknowledged that Abigail uses word approximations; she "does not have the verbal capacity to finish the whole sentence or even the whole word."

As Abigail grew up, Brian had financial troubles.  He sought Chapter 13 bankruptcy protection to forestall a residential foreclosure in

---

[4] We are aware of and have reviewed the details of these allegations. We will refer to the incident simply as the "abuse allegations."

6

January 2011. His wages were garnished for child support. He, apparently, has a significant child support arrearage. Brain faced three criminal charges for writing worthless checks. He finished making payments relating to those charges in December 2017.

Despite these hardships, Brian continued to see Abigail every other week, sometimes every week, and one week during the holidays. Brian claimed that Abigail visited his house "pretty much, every weekend" from January 2020 through March 2020. He testified that COVID ended the visits. The visits "never really restarted normally." He saw Abigail randomly between late 2020 and 2021. Ultimately, he learned that Abigail did not want to visit his house. She stopped visiting his house around September 2021.

On October 11, 2021, Madeline told Brian that Kimberly no longer lived with them. Brian spoke with Christine the next day. Brian expressed concern regarding Kimberly's use of Abigail's child support monies. He told Christine that it was time for Abigail to live with him. Christine told Brian about Abigail's Spelling to Communicate sessions. Brian asked his wife, Kera, to attend a session. Christine agreed to coordinate Kera's attendance.

Evelyn confirmed that Christine talked to her about Kera attending a session. Evelyn suggested that Kera attend the following week because there was no room for Kera to attend the upcoming session. Kera could not attend.

At an October 2021 session, Evelyn testified that Abigail kept repeating "no daddy's." When Evelyn asked Abigail what was going on, she spelled "he hit on me, he tried to . . . me." Abigail spelled out the name of the perpetrator. Evelyn, Christine, and Abigail reported the abuse allegations to DCF. A police report was admitted into evidence.

Jennifer Miller testified that she conducted two forensic interviews with Abigail about the abuse allegations. During the first interview, Abigail was distracted. Jennifer claimed that Christine told Abigail to use her voice and "go in and make that boy pay." Christine denied telling Abigail to "be brave" or calling the alleged abuser "a bad boy." Instead, Christine described mirroring back what Abigail previously told her in an attempt to empower her. Jennifer did not recall what Abigail stated during the second interview but noted that Abigail was uncooperative.

Detective Carrero testified that he interviewed Abigail twice. He testified that Abigail used her letter board to spell "that she was not protected from . . . abuse." The detective noted that Abigail "never outright made an allegation to us that someone . . . abused her." He clarified that Abigail told another officer that someone "tried to . . . [abuse] her."

Abigail did not visit Brian again until the trial court ordered the visits to resume at Grandma Carol's house in January 2023. The alleged abuser does not attend those visits.

Brian testified that he would not rip Abigail from Christine's home. He would "put a plan together to basically transition her." Brian knew nothing about Abigail's medical or educational providers or her friends. He never requested information about them. Although Brian might move Abigail to a school closer to his home, he did not know how he would address her schooling. He did not know what school she currently attended.

Brian and Kera both doubted the value of Spelling to Communicate. Brian believed that Spelling to Communicate should not be Abigail's primary method of communication. He claimed that Christine made the decision to use Spelling to Communicate without his

8

input.  Kera observed that Spelling to Communicate is not research-based and "it's, kind of, a joke."

Brian testified he would not take Spelling to Communicate away from Abigail.  When asked if he or anyone in his family was willing to become Abigail's facilitator for Spelling to Communicate, Brian conceded that he is not sure how he could be involved.  Brian never contacted Spelling to Communicate to learn about the curriculum.  He claimed that the tool was not accredited and that individuals associated with Spelling to Communicate had made "horrible misrepresentations" about him. When asked if she would use Spelling to Communicate with Abigail, Kera said she would look into it.

Brian believed that he is "entitled to have an opinion, along with Abby's mother, and make our decisions as the mother and father about what's best for our child."  Brian wanted to be Abigail's guardian because he is her father and accuses Christine of making it difficult for Abigail to visit him.

Brian's other daughter, Madeline, disagreed.  Madeline testified that Brian had not reached out to her since she filed her petition for guardianship.  Madeline testified that as the sisters grew older, visitation with Brian was inconsistent.  Typically, they only visited Brian on weekends, with an occasional week-long summer visit.

Madeline testified that the weekend visits ended in January 2020, when Abigail refused to visit Brian's house.  Christine confirmed that Abigail began to say "no daddy's" after visits with Brian in January 2020. Madeline testified that on one occasion, Christine, Kera, and Grandma Carol encouraged Abigail to visit; she screamed and cried.  Madeline testified that Abigail sometimes refused to go to Brian's house for dinner

9

with her. Christine explained that Abigail wanted to see Brian at Grandma Carol's house.

Despite Abigail's limitations, Madeline testified that Abigail is intelligent, competent, strong-minded, and clear about what she wants. Madeline does not believe that Christine had influenced Abigail in any negative way. Rather, Madeline believed that Abigail's behavior changed for the better when Christine introduced her to the Spelling to Communicate letter board. Abigail no longer isolates herself, is happier, and spends more time with her sisters.

Madeline voiced concern about Brian becoming Abigail's guardian. Abigail wants to live with Christine and wants her as her advocate. Madeline complained that appointing Brian would "uproot" Abigail's life. Abigail does not feel safe at Brian's house. She is happy with the routine and schedule set by Christine.

Christine detailed her care of Abigail and her current living situation. Christine established a special needs trust for Abigail in 2016 to ensure her continued care. When Abigail became an adult, she attended online school and later began an adult day program. Christine became a qualified child development provider to arrange care and programs for Abigail. Abigail attends school, mental health counseling, music therapy, and church. She spends time with friends and enjoys the mall.

Evelyn testified that Spelling to Communicate has enhanced Abigail's ability to communicate. Abigail has become more social. Evelyn testified that Abigail is not as overwhelmed or emotionally distressed as she was when she first started the program. Evelyn explained that Abigail can spell words, but she needs a communication partner because of her motor and sensory impairments, Autism, and

apraxia. Evelyn reported that Abigail told her, "I started Spelling to Communicate almost two years ago and life has never been better. All of my thoughts I am now able to release."

As the hearing came to a close, Brian argued that he would be the best decision maker for Abigail. Christine contended that she would serve Abigail's best interests. Afterall, she argued, Abigail has lived with her for many years. Abigail wants to stay with her. Christine places Abigail's needs and well-being ahead of her own. Abigail's court-appointed lawyer expressed that Abigail "has a much higher comprehension than she's given credit for." The lawyer stated that Abigail wants Christine to be her guardian and wants to remain with Christine. The lawyer stressed, "We're all aware of her fear of interacting with [the alleged abuser]," who lives with Brian. The lawyer continued, "None of us really know what happened or did not happen. But we know that Abby still expresses great fear and anger about the alleged incident."

*C. The Trial Court's Ruling*

In late August 2023, the trial court rendered its written order appointing Brian as guardian advocate. The trial court stated that it weighed Abigail's wishes presented "through Spelling to Communicate as relayed by her counsel . . . cautiously and seriously." The order notes that the trial court "received little evidence regarding the scientific reliability . . . of Spelling to Communicate." The trial court found that Abigail is reluctant to transition to a new setting. The trial court did not describe other essential factors it believed that Abigail would discount to stay in her current surroundings.

The trial court also found that the circumstantial evidence suggested that Christine limited Brian's access to Abigail. The trial court found that Brian had the ability to meet Abigail's unique needs. The trial

11

court believed that Brian "would be well-suited to take [Abigail's] wishes and interests into consideration regarding" the alleged abuse.

## II.    Discussion

According to Christine, the trial court abused its discretion in appointing Brian.  She argues that the trial court failed to consider evidence that Abigail's wished to remain with Christine, Brian was minimally involved in Abigail's life, Brian disregarded Abigail's safety concerns and abuse allegations, Brian disregarded Abigail's form of communication, and Brian would not meet Abigail's social, medical, and communication needs.  Brian applauds the trial court's decision.  He accuses Christine of isolating Abigail.  Brian maintains that nothing shows that Abigail will not thrive in his care.  He also notes that nothing corroborates Abigail's abuse allegations.

The trial court's order is, indeed, subject to an abuse of discretion review.  *See Morris v. Knight*, 1 So. 3d 1236, 1238 (Fla. 4th DCA 2009).  The order "must be supported by logic and justification and founded on substantial competent evidence."  *Id.* (citing *In re Guardianship of Sitter*, 779 So. 2d 346, 348 (Fla. 2d DCA 2000)).  We will reverse only where "no reasonable person would take the view adopted by the trial court."  *See id.* (quoting *Wilson v. Robinson*, 917 So. 2d 312 (Fla. 5th DCA 2005)).

The trial court "may appoint any person who is fit and proper and qualified to act as guardian."  § 744.312(2), Fla. Stat. (2021).

> The court shall give preference to the appointment of a person who:
>
> (a) Is related by blood or marriage to the ward;
>
> (b) Has educational, professional, or business experience relevant to the nature of the services sought to be provided;
>
> (c) Has the capacity to manage the financial resources involved; or

12

(d) Has the ability to meet the requirements of the law and the unique needs of the individual case.

§ 744.312(2).  The trial court must also:

(a) Consider the wishes expressed by an incapacitated person as to who shall be appointed guardian.

. . . .

(d) Consider the wishes of the ward's next of kin, when the ward cannot express a preference.

(e) Inquire into and consider potential disqualifications under s. 744.309 and potential conflicts of interest under s. 744.446.

§ 744.312(3).  "The order appointing a guardian must be consistent with the incapacitated person's welfare and safety . . . ."  § 744.2005(3).

Competent substantial evidence does not support the trial court's decision.  In large part, the trial court's decision is premised on a perception that Christine limited Brian's access to Abigail after Kimberly left Abigail with Christine.  But Brian testified that his contact with Abigail became limited in the summer of 2020 because of COVID.  He learned that Abigail no longer wanted to visit his house in September 2021, before Kimberly exited the stage.

Madeline's testimony also makes clear that in 2020, she, Christine, Grandma Carol, another sister, and Kera encouraged Abigail to visit Brian's house; Abigail became overwrought.  None of the eyewitnesses denied that this occurred.  Nor did the trial court question Madeline's credibility.  Contrary to the trial court's finding, the testimony established that Abigail refused to visit Brian's house before Kimberly left her with Christine.

13

Brian admitted that he requested no information about Abigail's medical or educational providers or friends. Although the trial court reasoned that Christine's conduct resulted in Brian's unfamiliarity with Abigail's needs, the trial court did not address Brian's lack of initiative or discuss any evidence reflecting that Christine prevented Brian from seeking information. The record reflects that Christine attempted to facilitate Kera's attendance at a Spelling to Communicate session.

Next, the order provides that Abigail's counsel expressed her preference for Christine and the trial court accepted Abigail's wishes "as relayed by her counsel." But the trial court ignored that Abigail, herself, testified about her wishes at the earlier hearing before the general magistrate. Abigail testified that she wants Christine to help her make decisions. Abigail further explained that she wanted to visit Brian. But, she felt unsafe at Brian's house because of the abuse allegations.

All seemed to agree that they may never know the whole story about the abuse allegations. The undisputed evidence, however, demonstrates that Abigail was traumatized by the thought of being at Brian's house.

The evidence does not support the trial court's finding that Brian was "well-suited to take [Abigail's] wishes and interest into consideration regarding" the abuse allegations. Brian denied that any abuse occurred; he failed to recognize Abigail's fears. Brian admitted that the alleged abuser still lives at his house. Brian expected that Abigail would live there. But he offered no plan to address Abigail's concerns.

The evidence suggests that Brian is not willing and able to meet Abigail's needs, specifically, her primary form of communication. As the trial court stated, Abigail has taken "a remarkable leap forward in her communication skills" since Christine enrolled her in Spelling to

14

Communicate. Brian testified that he would not take Abigail away from Spelling to Communicate. But, he was not sure how he could be involved with or become a facilitator for Spelling to Communicate. Brian was averse to being personally involved with Spelling to Communicate, despite Abigail's need for and improvements with the program.

The trial court also found that Brian's past financial struggles were too remote to show an inability to manage Abigail's financial affairs. Brian admitted to financial troubles in 2011 and 2017. He conceded that his wages were garnished for child support but did not clarify when. Christine's undisputed testimony was that Brian owed $40,000 in child support arrearage as of early January 2022.

Perhaps, the trial court's decision to appoint Brian was premature. No competent substantial evidence demonstrates that Brian can meet Abigail's unique needs or that his appointment was consistent with her welfare and safety. *See* § 744.2005(2)(b), (3).

We recognize that Brian is Abigail's father. But, based on our record, we feel compelled to reverse. *See generally Ash v. Ash*, 332 So. 3d 563, 570 (Fla. 3d DCA 2021) ("An appellate court defers to a circuit court's findings of fact when they are based on competent substantial evidence. [Any] 'presumption of correctness never requires an appellate court to disregard record evidence that disproves the lower court's findings or that reveals its ruling to be an abuse of discretion.' " (citation omitted) (quoting *In re Doe*, 932 So. 2d 278, 284 (Fla. 2d DCA 2005))).

### III.  Conclusion

On remand, the trial court may take additional evidence—including Abigail's testimony via an intermediary— if necessary to determine who would serve Abigail's best interests as her guardian advocate.

Reversed and remanded.

15

NORTHCUTT and CASANUEVA, JJ., Concur.

_____

Opinion subject to revision prior to official publication.